UNITED STATES DISTRICT COURT
DISTRICT OF NEW HAMPSHIRE

| | |
|---|---|
| IN THE MATTER OF THE SEARCH OF THE CELLULAR TELEPHONE ASSIGNED CALL NUMBER (781) 312-5845 | Case No.   19-mj-216-01-AJ<br><br>**Filed Under Seal** |

**AFFIDAVIT IN SUPPORT OF**
**AN APPLICATION FOR A SEARCH WARRANT**

I, Task Force Officer Joseph DeWitt, being first duly sworn, hereby depose and state as follows:

**INTRODUCTION AND TASK FORCE OFFICER BACKGROUND**

1. I make this affidavit in support of an application for a search warrant under Federal Rule of Criminal Procedure 41 and 18 U.S.C. § 2703(c)(1)(A) for information about the location of the cellular telephone assigned call number (781) 312-5845 ("the Target Telephone"), subscribed to Michael Vasquez at ▇▇▇▇▇▇ Lawrence, Massachusetts, with service provided by T-Mobile USA INC/Metro PCS, a wireless telephone service provider headquartered at 4 Sylvan Way, Parsippany, New Jersey, believed to be used by the target, an unknown male known as "John." The target telephone is described herein and in Attachment A, and the location information to be seized is described herein and in Attachment B. As described more fully in Attachment B, this application requests data about the physical location of the target telephone including but not limited to E-911 Phase II data (or the specific latitude and longitude or other precise location information) for a period of thirty (30) days.

2. I am a Detective with the Nashua Police Department (NPD) and have been a full time certified Police Officer in the state of New Hampshire since 2009. In October 2015, I was assigned as a detective to the Criminal Investigation Division (CID) where my primary

responsibility was to investigate felony level crimes occurring within the city of Nashua. In September 2018, I was transferred to the Narcotics Intelligence Division (NID) where my primary responsibility was conducting felony level investigations based on violations specified by the New Hampshire Criminal Code 318-B:2.

3. In September 2019, I was assigned as a Task Force Officer to the DEA Strike Force-Manchester District Office. While assigned to the DEA Strike Force, my primary duties have been to investigate the unlawful distribution of controlled substances, including violations of Title 21, United States Code, Sections 841 and 846.

4. I have attended narcotics and criminal investigation training classes put on by the New Hampshire Police Standards and Training Council, the DEA, the Northeast Counterdrug Training Center, and by the Nashua Police Department. Through my training, education, and experience, I have become generally familiar with the manner in which drug trafficking organizations ("DTOs") conduct their illegal activities, including purchasing, manufacturing, storing, and distributing narcotics, the laundering of illegal proceeds, and the efforts of persons involved in such activity to avoid detection by law enforcement. In the course of participating in investigations of DTOs, I have conducted or participated in surveillance, the purchase of illegal drugs, the execution of search warrants, debriefings of subjects, witnesses, and informants, and review of consensually recorded conversations and meetings. Based on my training and experience, I am aware that telephonic communications play an important role in these illegal activities.

5. I am an investigative or law enforcement officer of the United States, within the meaning of Section 2510 (7) of Title 18, United States Code, and am empowered by law to conduct investigations of and to make arrests for offenses enumerated in Section 2516 of Title 18, United States Code.

6. I am familiar with the facts and circumstances of this investigation from my own personal participation and from oral and written reports given to me by other DEA Agents, Task Force Officers, and local police departments. Since this affidavit is being submitted for the limited purpose of establishing that probable cause exists to support the issuance of a search warrant, I have not included details about every aspect of the investigation. While this affidavit contains all the material information I am aware of that is pertinent to the requested search warrant, it does not set forth all of my knowledge about this matter.

7. Based on the facts set forth in this affidavit, I submit that there is probable cause to believe, and I do believe, that violations of Title 21, United States Code, Sections 841(a)(1) and 846 (conspiracy to distribute controlled substances) have been committed, are being committed, and will be committed by the target known as "John," and others known and unknown. I submit that there is also probable cause to believe, and I do believe, that the location information described in Attachment B will constitute evidence of these criminal violations and will lead to the identification of individuals who are engaged in the commission of these offenses.

**PROBABLE CAUSE**

Background of the Investigation

8. Since June of 2019, other law enforcement officers and I have been conducting an investigation of a drug trafficking organization, the "John" DTO, which is operating in

Massachusetts and New Hampshire. One of the targets of this investigation is an unidentified Hispanic male known as "John." Information from a cooperating individual, controlled purchases of narcotics and surveillance indicates that "John" obtains and redistributes fentanyl to Massachusetts and Southern New Hampshire.

9. This investigation began in 2019 when law enforcement began using a Confidential Source[1] ("CS#1) to purchase fentanyl/heroin and gather intelligence from the "John" DTO. Specifically, CS #1 had previously purchased fentanyl from "John" in the area of ▌ Colby Street, Lawrence, Massachusetts. CS #1 stated that "John" also utilized several "runners," and that "John" would direct C S#1 to a location in the area of Colby Street to meet with the "runners." CS #1 described "John" as a 35-45 year old Hispanic male with a stalky build, and estimated that he was 5 feet 8 inches to 6 feet tall. CS #1 had previously met with "John" and purchased fentanyl/heroin, and believed he lived in the immediate area of ▌ Colby Street, Lawrence, Massachusetts. During the initial investigation, CS #1 had several telephone numbers previously used to contact "John," but during the time CS began providing information to investigators "John" was using ▌ 6799 (the "6799 number"). The subscriber for this number was identified as "Pablo Gonzalez" of ▌, Chelsea, Massachusetts.

10. On August 1, 2019 at approximately 11:45 AM, law enforcement conducted a controlled purchase of fentanyl/heroin from "John" utilizing CS #1. Prior to this purchase, CS #1had been in contact with the 6799 number via text messages, and negotiated the purchase of a

---

[1] Confidential Source #1: As part of this investigation I have received information from a source I will refer to as CS #1. CS #1 has been convicted of Willful Concealment (2008), Receiving Stolen Property (2009), Sale of a Controlled Drug (2011), Simple Assault (2017), and Willful Concealment (2018). CS #1 is working with law enforcement in the hope of receiving leniency on outstanding charges. During the investigation, CS #1 successfully completed controlled buys at DEA's direction. In addition, the DEA corroborated the information provided by CS #1 through physical and electronic surveillance where possible. For these reasons, I consider the information provided by CS #1 to be reliable.

"finger" of fentanyl/heroin for $250.00.[2]  CS# 1 then met investigators at a predetermined meeting location in New Hampshire, and at the direction of investigators, CS #1 called the 6799 number to confirm the deal.  At this time, an unknown Hispanic male answered the call with a strong Spanish accent.  CS #1 told the Hispanic male that CS #1 was on his/her way to Colby Street, and the Hispanic male told CS #1 that he was already there and waiting for CS #1.  The telephone call was then ended, and surveillance was established in the area of Colby Street.  Investigators asked CS #1 who CS #1 had talked to on the phone, and CS#1 advised that the subject was "John."

      11.     Prior to the deal, law enforcement searched CS #1's person and vehicle, and found that both were free and clear of any drugs, monies, and/or contraband.  CS #1 was then outfitted with audio and video recording/transmitting equipment, and was provided with $250 in Official Advance Funds (OAF).  At approximately 1:03 PM, CS #1 arrived on Colby Street, and surveillance was maintained on CS #1 by investigators at all times.  At approximately 1:08 PM, CS #1 called the 6799 number, and informed the target that CS #1 was at the agreed upon location.  At approximately 1:12 PM, investigators observed a white Honda Accord bearing Massachusetts registration number 7GV927 pull up to CS #1's driver's side window.  At this time, members of the surveillance team were able to observe that the Honda Accord was occupied by a single Hispanic male operator (UM1), and observed a hand to hand exchange between CS #1 and UM1.

      12.     CS #1 then returned to a predetermined meet location, and provided investigators with a clear bag of tan powder.  Based on the training and experience of the investigators, they believed the tan substance was fentanyl/heroin.  At this time, CS #1's person and vehicle were again searched, and found to be free and clear of any drugs, monies, and/or contraband.  CS #1 advised that CS #1 had responded to Colby Street, met with an unknown Hispanic male (UM1),

---

[2] These communication occurred outside the presence of law enforcement.  Law enforcement subsequently reviewed the text messages arranging the controlled transaction.

and exchanged $250 in OAF for the tan substance surrendered to investigators. CS #1 reported that CS #1 did not recognize UM1, and had never dealt with him on prior occasions.

13. After the drug transaction, the surveillance team followed UM1 to ▇ Sherman Street, Lawrence, Massachusetts. Investigators conducted a registration search for the Honda Accord via the Massachusetts Registry of Motor Vehicle (RMV), and learned that the vehicle was registered to ▇ VILLAR of ▇ Sherman Street, Lawrence, Massachusetts. Investigators then conducted a search via social media, and photographs of VILLAR's boyfriend were obtained. Upon viewing the social media photographs, investigators were able to positively identify VILLAR's boyfriend as UM1. Through cooperation with the Massachusetts RMV, and by utilizing facial recognition software, investigators were able to identify UM1 as ▇ AYBAR-ARIAS with a last known address of ▇ Sherman Street.

14. On August 16, 2019, CS #1 contacted investigators and advised that "John" contacted him/her via Facebook messenger, and that "John" sent photographs of himself to CS #1. CS #1 provided the messages and photographs to investigators, and CS #1 confirmed that the depicted subject was the same individual CS #1 knew as "John." Investigators were able to identify the Facebook name as "Jhon Perez" with a Facebook Identification Number 100040290075767.

15. On August 21, 2019, CS #1 advised investigators that "John" was utilizing a new telephone number, and that CS#1 was in communication with "John" via this number. C S#1 advised that the new number was ▇-4888 (the "4888 number"). Investigators learned that the subscriber for this number was Pablo Gonzales with an address of ▇ Washington Street, Lawrence, Massachusetts.

16. On August 21, 2019 at approximately 12:30 PM, law enforcement conducted a controlled purchase of fentanyl/heroin from "John" utilizing CS #1. Prior to this time, CS #1 had been in contact with the 4888 number via text messages, and negotiated the purchase of two "fingers" of fentanyl/heroin for $500.00.[3] CS# 1 then met investigators at a predetermined meeting location in New Hampshire, and at the direction of investigators, CS #1 called the 4888 number to confirm the deal. At this time, an unknown Hispanic male answered the call with a strong Spanish accent. The Hispanic male confirmed the deal and meeting location, and the phone call was ended. Upon concluding the call, CS #1 received a text message from the aforementioned number, and was directed to ▓ Park Street, Lawrence, Massachusetts to conduct the deal. Investigators asked CS #1 who CS #1 had talked to on the phone, and CS#1 advised that the subject was "John".

17. After concluding the call, CS #1's person and vehicle were searched, and were found to be free and clear of any drugs, monies, and/or contraband. CS #1 was then outfitted with audio and video recording/transmitting equipment, and provided $500.00 in OAF. At this time, investigators followed CS #1 to ▓ Park Street Lawrence, Massachusetts, and CS #1 pulled into a parking area at the location. Due to the physical layout of the area, investigators were unable to maintain physical surveillance of CS #1, but CS #1's vehicle was outfitted with a video/audio transmitting device so that investigators could monitor the deal in real time. At approximately 1:20 PM, investigators were able to hear CS #1 say "thank you" via the audio transmitting device. CS #1 then pulled from the area, and investigators followed CS #1 to a predetermined meeting location. Upon arrival, CS #1 provided investigators with two glassine bags containing a tan powder, which investigators believed was heroin/fentanyl, based on their training and experience.

---

[3] These communication occurred outside the presence of law enforcement. Law enforcement subsequently reviewed the text messages arranging the controlled transaction.

7

A search of CS #1's person and vehicle was again conducted, and CS #1 was found to be free and clear of any drugs, monies, and/or contraband.

18.     Investigators then interviewed CS #1 about the transaction, and CS #1 advised that CS #1 had responded to ___ Park Street, and made contact with an older dark skinned Hispanic male wearing a black shirt, a hat, and glasses (UM2). CS #1 advised that UM2 appeared to be waiting for CS #1 at the location. CS #1 advised that CS #1 provided UM2 with the $500.00 in OAF, and UM2 provided CS #1 with the two bags of suspected fentanyl/heroin. CS #1 stated that CS #1 had never seen UM2, and confirmed that UM2 was not the subject CS #1 knew as "John."

19.     On September 5, 2019 at approximately 12:45 PM, law enforcement conducted a controlled purchase of fentanyl/heroin from "John" utilizing CS #1. Prior to this purchase, and at the direction of investigators, CS #1 had been in contact with the 4888 number via text messages, and negotiated the purchase of two "finger" of fentanyl/heroin for $500.00.[4] CS# 1 then met investigators at a predetermined meeting location in New Hampshire, and at the direction of investigators, CS #1 called the 4888 number to confirm the deal. At this time, an unknown Hispanic male with a strong Spanish accent answered the call, and confirmed the deal and meeting location (Colby Street). Upon concluding the call, investigators asked CS #1 who CS #1 had spoken to, and CS #1 advised that it was the subject CS #1 knew as "John."

20.     Prior to the deal, CS #1's person and vehicle were searched by investigators, and both were found to be free and clear of any drugs, monies, and/or contraband. CS #1 was then outfitted with audio and video recording/transmitting equipment, and provided $500.00 in OAF. Investigators then followed CS #1 to Colby Street, and constant surveillance of CS #1 was maintained. Upon arrival on Colby Street, CS #1 contacted the 4888 number, and was redirected

---

[4] These communication occurred outside the presence of law enforcement. Law enforcement subsequently reviewed the text messages arranging the controlled transaction.

to Linehan Street, Lawrence, Massachusetts, which was a couple of blocks from Colby Street. CS #1 then responded to said location after conferring with investigators. Upon arrival on Linehan Street, a young 18-25 year old Hispanic male (UM3) entered the front passenger seat of CS #1's vehicle. CS #1 then handed UM3 the OAF, and UM3 handed CS #1 two cylinders of compressed tan powder. UM3 then exited CS #1's vehicle, and the surveillance team lost sight of UM3 and were unable to follow him further.

21. Investigators then followed CS #1 to a predetermined location, and CS #1 provided investigators with the two compressed cylinders of compressed tan powder. Based on the training and experience of investigators, they believed the substance to be fentanyl/heroin. At this time, CS #1 and CS #1's vehicle were searched, and found to be free and clear of any drugs, monies, and/or contraband. Investigators then interviewed CS #1 about the deal, and CS #1 advised that CS #1 responded to Linehan Street, Lawrence, Massachusetts after being redirected by "John." CS #1 stated that UM3 was walking in the area, and entered his/her vehicle. CS #1 advised that CS #1 provided UM3 with the OAF, and UM3 provided CS #1 with the two compressed cylinders that were turned over to investigators. CS #1 stated that CS #1 had never seen UM3 previously, and did not know his identity.

22. On September 26, 2019 at approximately 12:31 PM, law enforcement conducted a controlled purchase of fentanyl/heroin from "John" utilizing CS #1. Prior to this purchase, and at the direction of investigators, CS #1 had been in contact with the 4888 number via text messages, and negotiated the purchase of two "fingers" of fentanyl/heroin for $500.00. CS# 1 then met investigators at a predetermined meeting location in New Hampshire, and at the direction of investigators, CS #1 called the 4888 number to confirm the deal. At this time, an unknown Hispanic male answered the call with a strong Spanish accent, and directed CS #1 to ▮▮▮▮ Park

9

Street Lawrence, Massachusetts. Upon concluding the call, investigators asked CS #1 who CS #1 had spoken to, and CS #1 advised that CS #1 had spoken to "John."

23. Prior to the deal, CS #1's person and vehicle were searched by investigators, and found to be free and clear of any drugs, monies, and/or contraband. CS #1 was then outfitted with audio and video recording/transmitting equipment, and provided $500.00 in OAF. Investigators then followed CS #1 to ___ Park Street, and surveillance of CS #1 was uninterrupted.

24. At approximately 1:06 PM, CS #1 arrived at ___ Park Street, and investigators were able to monitor the audio/video of the deal live via the transmitting device placed in the vehicle. At this time, a middle aged Hispanic male wearing a white baseball hat, a camouflaged shirt, and glasses (UM4) entered the passenger seat of the vehicle. UM4 then provided CS #1 with a clear plastic bag containing compressed tan powder, and CS #1 provided UM4 with the OAF. CS #1 then asked UM4 about prices for higher quantity fentanyl/heroin, and UM4 appeared to agree to this for future deals. UM4 then exited the vehicle, and CS #1 drove from the area.

25. The surveillance team then followed UM4, and observed him go into several local businesses in the area. UM4 was seen on his cell phone, and was then picked up by a taxi cab. The surveillance team then followed the taxi cab to ___ William Street, Lawrence, MA. The surveillance team observed UM4 walk toward the front door of ___ William Street, but momentarily lost visual contact of UM4. Upon re-establishing a visual of ___ William Street, the surveillance team observed that UM4 was no longer out front of the location. Based on the timing, and prior observations made by the surveillance team, it was clear that UM4 had entered the front door of ___ William Street. After a period of time, surveillance of the location was ended.

26. During the time UM4 was being surveilled, CS #1 was followed by investigators to a predetermined meeting location. CS #1 then provided investigators with the tan powder

substance obtained from UM4, which they believed to be fentanyl/heroin based on their training and experience, and CS #1's person and vehicle were again searched and found to be free and clear of any drugs, monies, and/or contraband.

27. At this time, CS #1 confirmed what had already been observed by investigators in regards to the deal, and CS #1 advised that CS #1 did not recognize UM4 and had never met with him previously. CS #1 advised that after the deal, CS #1 had been contacted by "John" via text message by the 4888 number. Investigators viewed the text messages, and learned that "John" contacted CS #1 to discussing prices. At approximately 1:08 PM, CS #1 received a message from the user of the 4888 number that said "who told my friend that I give you 5 for $1000". CS #1 responded "Im asking for a deal if I buy a lot," and then received a message that said "Ok 5 for 1000$".

28. On October 8, 2019, investigators conducted an open source search for arrests made at the addresses surrounding the driveway between ▓ Colby Street and ▓ Ferry Street, this being the driveway CS #1 had seen "John" exit during the previous deals with him. During this search, investigators received a result an arrest in 2016 of Jonathan SOLDEVILLE-ORTIZ with an address of ▓ Ferry Street. Investigators then obtained photographs of SOLDEVILLE-ORTIZ to include booking photographs and a Massachusetts driver's license photograph. Investigators compared the aforementioned photographs to the Facebook photographs of "John" provided by CS #1, and found them to be a match. Upon reviewing SOLDEVILLE-ORTIZ's criminal record, investigators learned that SOLDEVILLE-ORTIZ was arrested on February 17, 2017 for sale of a class A controlled substance by Lawrence Police Department. Investigators learned that as a result SOLDEVILLE-ORTIZ had been incarcerated since November 19, 2018, and was currently being held at Old Colony Correctional Center.

29.     On October 9, 2019, investigators made contact with CS #1, and learned that CS #1 had been contacted by text message via the Target Telephone (781-312-5845). CS #1 stated that CS #1 was told via text that the number belonged to "Jon," and investigators were able to view the messages and confirm this. CS #1 asked if the sender of the text message was John or the runner, and the sender simply said "Si."

30.     On October 9, 2019, at approximately 3:40 PM, investigators established surveillance at      William Street, Lawrence, Massachusetts, and observed several vehicles parked at the location. Investigators observed one of the vehicles to be the white Honda Accord bearing Massachusetts registration number 7GV927, this being the vehicle registered to         VILLAR and driven by         AYBAR-ARIAS during the deal with CS #1 on August 1, 2019. At approximately 4:22 PM, investigators observed AYBAR-ARIAS and several other subjects exit the front door of     William Street. AYBAR-ARIAS then entered the driver's seat of the Honda Accord, and pulled from the area.

31.     On October 22, 2019, at approximately 1:21 PM, CS #1 contacted the Target Telephone at the direction of investigators. CS #1 sent a messages saying "Hey 2 finger next week," "Hola," and "Hello." CS #1 then received two messages from the Target Telephone, which said "Tuday?," and "Ok." CS #1 later texted saying "can u do 2 finger for 400," and received a message that said "5 for 1000$."

32.     I believe that location information obtained from the Target Telephone, when used in conjunction with other information obtained from cooperating individuals, surveillance, and over the intercepted calls, may assist the United States in allowing investigators to identify locations where he stores drugs and drug proceeds and conduct surveillance of possible meetings with associates and sources of supply.

33. In my training and experience, I have learned that T-Mobile USA INC/Metro PCS is a company that provides cellular telephone access to the general public. I also know that providers of cellular telephone service have technical capabilities that allow them to collect and generate at least two kinds of information about the locations of the cellular telephones to which they provide service: (1) E-911 Phase II data, also known as GPS data or latitude-longitude data, and (2) cell-site data, also known as "tower/face information" or cell tower/sector records. E-911 Phase II data provides relatively precise location information about the cellular telephone itself, either via GPS tracking technology built into the phone or by triangulating on the device's signal using data from several of the provider's cell towers. Cell-site data identifies the "cell towers" (i.e., antenna towers covering specific geographic areas) that received a radio signal from the cellular telephone and, in some cases, the "sector" (i.e., faces of the towers) to which the telephone connected. These towers are often a half-mile or more apart, even in urban areas, and can be 10 or more miles apart in rural areas. Furthermore, the tower closest to a wireless device does not necessarily serve every call made to or from that device. Accordingly, cell-site data is typically less precise than E-911 Phase II data.

34. Based on my training and experience, I know that T-Mobile USA INC/Metro PCS can collect E-911 Phase II data about the location of the Target Telephone, including by initiating a signal to determine the location of the Target Telephone on T-Mobile USA INC/Metro PCS' networks or with such other reference points as may be reasonably available.

35. Based on my training and experience, I know that T-Mobile USA INC/Metro PCS can collect cell-site data about the Target Telephone.

## AUTHORIZATION REQUEST

36. Based on the foregoing, I request that the Court issue the proposed search warrant, pursuant to Federal Rule of Criminal Procedure 41 and 18 U.S.C. § 2703(c).

37. I further request, pursuant to 18 U.S.C. § 3103a(b) and Federal Rule of Criminal Procedure 41(f)(3), that the Court authorize the officer executing the warrant to delay notice until 30 days after the collection authorized by the warrants has been completed. There is reasonable cause to believe that providing immediate notification of the warrants may have an adverse result, as defined in 18 U.S.C. § 2705. Providing immediate notice to the user of the Target Telephone would seriously jeopardize the ongoing investigation, as such a disclosure would give this person an opportunity to destroy evidence, change patterns of behavior, notify confederates, and flee from prosecution. *See* 18 U.S.C. § 3103a(b)(1). As further specified in Attachment B, which is incorporated into the warrant, the proposed search warrant does not authorize the seizure of any tangible property. *See* 18 U.S.C. § 3103a(b)(2). Moreover, to the extent that the warrant authorizes the seizure of any wire or electronic communication (as defined in 18 U.S.C. § 2510) or any stored wire or electronic information, there is reasonable necessity for the seizure for the reasons set forth above. *See* 18 U.S.C. § 3103a(b)(2).

38. I further request that the Court direct T-Mobile USA INC/Metro PCS to disclose to the government any information described in Attachment B that is within the possession, custody, or control of T-Mobile USA INC/Metro PCS. I also request that the Court direct T-Mobile USA INC/Metro PCS to furnish the government all information, facilities, and technical assistance necessary to accomplish the collection of the information described in Attachment B unobtrusively and with a minimum of interference with T-Mobile USA INC/Metro PCS' services, including by initiating a signal to determine the location of the Target Telephone on T-Mobile USA INC/Metro

PCS' networks or with such other reference points as may be reasonably available, and at such intervals and times directed by the government. The government shall reasonably compensate T-Mobile USA INC/Metro PCS for reasonable expenses incurred in furnishing such facilities or assistance.

39. I further request that the Court authorize execution of the warrant at any time of day or night, owing to the potential need to locate the Target Telephone outside of daytime hours.

I declare that the foregoing is true and correct.

/s/ Joseph M. DeWitt
Joseph M. DeWitt
Task Force Officer
Drug Enforcement Administration

Subscribed and sworn to before me this 25th day of October, 2019.

/s/ Andrea K. Johnstone
Hon. Andrea K. Johnstone
United States Magistrate Judge

## ATTACHMENT A

### Property to Be Searched

1. The cellular telephone assigned call number (781) 312-5845 ("the Target Telephone"), subscribed to Michael Vasquez at ▓ Lawrence, Lawrence, Massachusetts, with service provided by T-Mobile USA INC/Metro PCS, a wireless telephone service provider headquartered at 4 Sylvan Way, Parsippany, New Jersey, believed to be used by the "John" Drug Trafficking Organization.

2. Information about the location of the Target Telephone that is within the possession, custody, or control of T-Mobile USA INC/Metro PCS including information about the location of the cellular telephone if it is subsequently assigned a different call number.

## ATTACHMENT B

### Particular Things to be Seized

All information about the location of the Target Telephone described in Attachment A for a period of thirty days, during all times of day and night. "Information about the location of the Target Telephone" includes all available E-911 Phase II data, GPS data, latitude-longitude data, and other precise location information, as well as all data about which "cell towers" (i.e., antenna towers covering specific geographic areas) and "sectors" (i.e., faces of the towers) received a radio signal from the cellular telephone described in Attachment A.

To the extent that the information described in the previous paragraph (hereinafter, "Location Information") is within the possession, custody, or control of T-Mobile USA INC/Metro PCS, T-Mobile USA INC/Metro PCS is required to disclose the Location Information to the government. In addition, T-Mobile USA INC/Metro PCS must furnish the government all information, facilities, and technical assistance necessary to accomplish the collection of the Location Information unobtrusively and with a minimum of interference with T-Mobile USA INC/Metro PCS' services, including by initiating a signal to determine the location of the Target Telephone on T-Mobile USA INC/Metro PCS' network or with such other reference points as may be reasonably available, and at such intervals and times directed by the government. The government shall compensate T-Mobile USA INC/Metro PCS for reasonable expenses incurred in furnishing such facilities or assistance.

This warrant does not authorize the seizure of any tangible property. In approving this warrant, the Court finds reasonable necessity for the seizure of the Location Information. *See* 18 U.S.C. § 3103a(b)(2).